We thank the Court for granting oral argument on this matter. I know you've had a chance to digest the briefing, and I would like to focus my oral argument on the 12B1 dismissal grounds that were treated by the District Court. However, I am happy to answer any questions that the Court may have on other issues, such as the injunction on the use of the challenged communications or the alternative grounds for dismissal that have been raised by the defendants. Because the standard for a 12B1 dismissal, which you all well know, requires taking the allegations in the amended complaint as true and treating them in the light most favorable to the BCR parties. We believe it is imperative to understand what the claims are that were raised in the amended complaint by the BCR parties under those allegations, and equally important, what those claims aren't. We think that this gets to the heart of both of the 12B1 dismissal issues that were raised by the District Court, first being that the stipulated judgment in the Delaware Court collaterally stops the claims by the BCR parties with regard to what the District Court called the buyout-related claims, as well as to the issue as to whether or not the BCR parties' claims are direct claims. The District Court, of course, finding that they were derivative claims for the bucket of claims that the District Court characterized as the insurance litigation-related claims. What this is not, the BCR parties' claims are not a claim for coverage under the policies issued by Lloyds. So we believe the basis for the District Court's judgment dismissing the BCR parties' claims against Lloyds is unfounded, basically founded on a misunderstanding of what the claims are. This is also not a claim that PPF, one of the defendants, failed to comply with the express terms of the safeguard LLC agreement when it issued a buy-sell notice on May 14, 2009, or that it failed to comply with the terms of the LLC agreement when it set the total purchase price that was stated in that May 14, 2009, buy-sell notice. Accordingly, we think because those are the only issues that were actually litigated and actually determined in the Delaware stipulated judgment, that that basis for the District Court's ruling is also not supported by the facts or by the law under Delaware, which I'll get to in a moment. First, I'd like to go over what this claim is under the allegations in the amended complaint. This is a set of claims that Morgan Stanley had extensive business relationships separate and apart from the safeguard insurance matter with Lloyds, that it sought, that Morgan Stanley and the Morgan Stanley party sought to protect those separate business relationships at the expense of its minority partner in safeguard, the BCR parties. And hence, the damages and the claims that flow from that conflict and from the actions that Morgan Stanley took through that conflict are direct claims unique to the BCR parties. This is also a claim under the allegations of the amended complaint that Lloyds, aware of Morgan Stanley's conflict and needing to avoid the exposure under the safeguard insurance litigation, made demands on Morgan Stanley that Morgan Stanley take control and ownership of safeguard away from the BCR parties, essentially under any means possible. These are detailed allegations in the amended complaint that, acting on its conflict, the Morgan Stanley parties, in bad faith, agreed to comply with the demands that Lloyds was making on it to take control and ownership of safeguard away from the BCR parties, and that it did so in four particular ways that are separate and apart from what happened in that May 14, 2009, bisel notice. The first way is that Morgan Stanley surreptitiously assured Lloyds, well prior to the May 14, 2009, bisel notice, that safeguard would not be pursuing large bad faith claims against Lloyds. And indeed, using its position controlling two of the members of the management committee for safeguard, Morgan Stanley did block that bad faith claim from being made against Lloyds. The second thing that the Morgan Stanley parties did prior to the May 14, 2009, notice is when the principal of BCR went to Morgan Stanley and asked, are you going to go to the bisel provision once that window opens up to you, Morgan Stanley parties essentially lied to BCR and said, no, we're not going to concentrate on the insurance litigation. And what this did was it prevented the BCR parties from taking anticipatory steps of lining up alternative investors and alternative partners to be able to respond to any impending bisel notice, which is something that the BCR parties had been able to do before, which is how Morgan Stanley came into the company to begin with. You really do need to talk about how you're going to make the case that that Delaware stipulated judgment doesn't just foreclose your lawsuit. Absolutely, Your Honor. I think that is absolutely at the crux of this thing. I agree that that is an important issue. Part of the argument that you're making is that you are entitled, if the limited partnership had gotten the proceeds from the insurance more timely, that your clients would have gotten a piece of the action because of the distribution provisions in the limited partnership agreement. That, it seems to me, was resolved by that stipulated judgment. And furthermore, the only way that you can really make that claim, and you haven't made it with specificity, is if the provisions of the limited partnership agreement were, in essence, a cash-in, cash-out provision. And they're not. They're very complicated. It is not uncommon in a limited partnership agreement to have the cash flow differently from the alignment of ownership interests. That's not uncommon at all. But it's a very rare limited partnership agreement where it's cash-in, cash-out. Usually some provision is made to pay a few bills. There are some accruals that are made. And your agreement is like that. So on what basis do you escape that judgment? I think that there are three different issues that you've raised in your question. The first, I think, gets to what the BCR Party's claims are. And the district court characterized the BCR Party's claims as being for this, you know, if there had been a more timely and higher payout on the insurance litigation, that the BCR Parties would have somehow benefited. And that actually isn't the claims. The claim regarding the insurance litigation is, first, that it served as the motive for Lloyds to enter into this conspiracy with Morgan Stanley to take the ownership interests away. The motive, whatever the motive was, has been collapsed into a judgment. So... The Delaware litigation had nothing to do with what was happening in the insurance litigation before or after the May 14, 2009, buy-sell notice. The Delaware litigation did determine that the price, that it was okay to do the buyout and that the price was appropriately arrived at. The price for your client's interest was appropriately arrived at. And that's a marvelous word, by the way. I didn't ever use that when I was in private practice, but I think I was not fully competent. Appropriately. If that doesn't cover a multitude of potential sins, I don't know what does. Well, what PPF prayed for in the amended complaint in Delaware, and it's exactly what the declaratory relief was in the stipulated judgment, was limited to the express terms of the LLC agreement and to the terms that were spelled out in the May 14, 2009, buy-sell notice. The language was PPF's invocation of the buy-sell provision of the LLC agreement on May 14, 2009 was proper and that PPF acted appropriately in setting the total purchase price in that buy-sell notice. The misconduct that occurred, that I was laying out, that occurred before May 14, 2009, the surreptitious communications between Lloyds and Morgan Stanley, the misrepresentations about an impending buy-sell that was going to happen between Morgan Stanley and the BCR parties, and then conduct that happened during the buy-sell election period having nothing to do with the propriety of the terms set forth in the May 14, 2009 buy-sell notice, including there was a number of allegations of the misconduct that happened in the election period, but including filing a second Delaware action containing spurious allegations about mismanagement that clouded the ability of the BCR parties to be purchasing members under the buy-sell, I think is very key because none of that is dealt with in the Delaware litigation. Once you say it was okay for PPF to trigger the buy-sell provisions, it was okay for them to do it, which the Delaware court said, and that the price was appropriately arrived at and everything was fine, doesn't that, isn't that, I mean you have to get past that. But what that doesn't arrive at is then, yes, PPF had a right to invoke the buy-sell, to trigger the buy-sell period. What they didn't have a right to do was to foreclose the rights of the BCR parties during the buy-sell election period to take actions to be a purchasing member. There's this even weighing of powers under the buy-sell provision in that document, and what Morgan Stanley did at Lloyd's insistence and demand was make it impossible for that equal weighing to occur in reality. What the PPF parties themselves told the Delaware court in response to a motion to stay the Delaware proceedings that the BCR parties had filed was that the Delaware action concerns a discrete issue, whether the buy-sell transaction closed at the proper price and that the buy-sell claims in the Delaware action are in no way dependent upon the Louisiana claims, which are the actions that have evolved into litigation that's here today, and can be resolved separately. This is really the best evidence of what was actually litigated and what was actually determined in the Delaware litigation, because what we're looking at is issue preclusion, where you have to see was the issue actually litigated and actually determined, and here it clearly wasn't. And PPF's own representations to the Delaware court of what they were seeking and how it was different and distinct and completely separate from what was happening in the Louisiana action is really the best evidence of what was actually being litigated. And this language, while Judge Brown laid out when she was laying out the party's arguments, acknowledged this language in her analysis of the Delaware judgment and what it was actually litigating and actually providing for, didn't return to what is the effect of what PPF itself was representing to the Delaware court, was the discrete, their word, the discrete nature of the claims. So I think that really gets to the crux of the Delaware issue and the collateral estoppel is what was actually being litigated, and I think this court has to look at the record there to determine that, because the district court just left that part blank. And also I think there's an issue of judicial estoppel raised there by what PPF was telling the Delaware court when it was saying completely separate issues, and now it wants to come to this court and to the district court in this litigation and say not completely separate issues, it was all the same big ball of wax, when the record, the facts in the record, just don't support that. This second main issue that the district court raised was, you know, instead of taking the allegations and the claims as the BCR parties had laid them out in the amended complaint, the district court separated them into these two buckets. Lloyd's in their appeal brief pointed out that the district court distilled the BCR parties' allegations, which is not what the court should have done under the appropriate 12B1 standard. But it called a certain set of the claims insurance litigation-related claims and dismissed those as derivative. We think Delaware law is clear on three different bases why the BCR parties' claims should not be treated as derivative, but indeed are direct. The first relies on the Gentile v. Rossette case out of the Delaware Supreme Court in 2006, where claims are treated as direct when they involve allegations that the offending party used its power or control to advance its own interests to the detriment of the interests of its minority partner here, which would be the BCR parties. The Gentile v. Rossette case, this was from a dilution of the voting power and the control that the minority party had over the company in that instance, so that even though there's a diminution in the value of the overall shares of stock in that case, that should have applied to all shareholders because it also diluted their voting power. Delaware Supreme Court said it's a direct claim. The same thing happens here. As far as whether or not the Morgan Stanley Party should be seen as a controlling party, Delaware law also, in something that wasn't addressed by the district court, finds that negative control equals power, and here that would be the Morgan Stanley Party's control over half of the management committee, which it exercised demonstrably in blocking the bad faith claims from being raised against Lloyd's, but also the use of enormous equity power, which came into play during the by-sale election period. The second key reason why I think under Delaware law the district court was incorrect in finding this was a derivative claim was because in all the cases cited in our briefs, as well as in the briefs of the defendants, one of the markers of a derivative claim is whether or not there's pro-rata distribution rights, and here there's disproportionate distribution rights because, while our clients owned 6% of Safeguard at the time, they had the opportunity to have up to 40% distribution. The claims, however, the money has to go through, the cash in from the insurance proceeds have to go through that formula, which is mind-bending. I notice nobody even tried to explain that to us, but it is absolutely mind-bending, but it is definitely the exact opposite of cash in, cash out. Except that the LSE agreement, as part of that Section 9 of the LSE agreement where the waterfall provision is laid out, also provides that there are to be fairly immediate distributions of cash events into the company flowing to the members. So nothing gets deducted from the cash? I mean, we don't pay any expenses? There is some, but it's very minimal. This isn't the same thing as straight diminution of value claims, such as under Thule where you have just the traditional shareholder relationship. And that gets to the last reason, I think, why the derivative claims analysis of the district court was not correct, and that is whether or not this is a pass-through entity, which is essentially exactly the question that you're getting to. And we think the NAF decision out of the Second Circuit from this past November addresses the distinctions very well between the situation we have here and the situation, for instance, that was in the Thule decision. I see my time is up. I'm glad to answer any further questions. When you come back before you sit down, you need to tell us if, contrary to your very good argument, we didn't agree with you and we were going to affirm on the other, all the issues, except when we get down possibly to the, I'm sorry, the legal question about conflicts and so on at the end. The one remaining claim is that does that need to be decided? There's all those privilege issues. There's one of them that is potentially troublesome. Does that have to be decided if everything else is decided contrary to the way you want us to? So you need to tell us that. Okay. I will address that. Just one, it seems to me, that's at issue. All right. Thank you, sir. And you have reserved about time to come back up. All right. We'll hear from Mr. Vance first. Good morning, Your Honors. Patrick Vance on behalf of the Morgan Stanley parties. With me is Jake Shields from the Quinn Emanuel firm. I'm splitting my time, 12 minutes. Lloyd's my co-defendant. It's taken eight minutes. There are three distinct issues on appeal. And, Judge King, you've identified, I think, the winner for us, and that is this judgment that was entered in Delaware simply moots out any claims that they attempt to identify that is not related to the value of their interest in the LLC. The second issue is that this is really nothing more than a textbook derivative claim. The injury suffered. All of the injuries suffered. And this is what the district court found, were injuries to the LLC safeguard. And this notion that one of the exceptions, that we're the control party, is just not reflected by the plaintiff's own complaint. They say they were the manager. They were the manager. They had the CEO position. They had the CFO position. They had two seats on the management committee of the four-person management committee where it was required unanimous agreement on any major decision. So the idea that we had control, despite the fact that we were the 94% equity holder, is belied by the way this LLC agreement gave all of this power of the day-to-day management of the business to the BCR plaintiffs. And the third issue, I think, which you were addressing, perhaps, Judge King, at the very end, deals with the injunction which we think was properly entered, and we think, as a matter of fact, that the appellants have failed to challenge one aspect of that injunction, which was the fact that the Fourth Circuit Court of Appeal in Louisiana found specifically that eight of the ten communications were privileged, and they didn't challenge that on this appeal. And they also simply are wrong when they say that the district court, in its review, didn't do a document-by-document review. I think the record reflects that Judge Brown, in fact, did a document-by-document review, and she found initially that all ten of the documents were privileged communications. We think you should address that issue also, Your Honors, because, you know, you affirm the judgment here. That's not to say that this case is going to be over by any stretch of the imagination. There still is unrelated issues in state court that deal with cost and indemnity claims, and this case has been going on for close to seven years, and so I think we need to clean the record up and address all three of the issues in the court's order. Their argument seems to be grounded in the notion that the judge didn't understand what the cause of action was. Look, they had a 206-paragraph complaint that laid it all out, and Judge Brown wrote 70 pages of opinion, reasons for judgment, exhaustively analyzing each one of these claims. Part of what I heard today in this argument just is not consistent with what is contained in the complaint, and you can criticize the use of the word distill, but Judge Brown did distill very well what was being complained about, and what's being complained about is the lost opportunity to be a shareholder in the LLC and therefore reap the benefits of being an owner. But you know what? They lost that right. They lost that right in 2005 when the LLC agreement was first entered. That is when the buy-sell provision was agreed to. There's no conditions other than that each party must wait three years before it is invoked. It is an absolute right, and to suggest that we acted under the circumstances in some way using our majority control is simply not correct. That was a right that we were given, and in fact it was a right that was basically the quid pro quo for them having all of the day-to-day management authority. We don't think that anything that—I don't believe I heard anything that I would say was a specific failure of the district court in making a mistake that this court would say is clearly erroneous, and I don't think I've heard anything that would suggest that there's any basis other than to affirm this decision by Judge Brown. I don't think they met their burden on standing, but what they continue to do, and they did this at the district court, was they attempt to parse their claim in segments in such a way to make the argument that what they're saying has nothing to do with injury to their interest in safeguard. But when you distill it, when you analyze it, it all comes back to they lost their interest when they sold their interest in July of 2009 pursuant to the buy-sell agreement. They did it voluntarily. In fact, as they moved up the sale date, they were so anxious to receive the money from the buy-sell agreement. And, you know, what I find astonishing is that in their briefs, in their arguments this morning, you did not hear that they received $10 million for their 6 percent interest in this company. They got $10 million. You know, why do you think that my client was interested in making sure that there was a judgment that this buy-sell agreement had been properly invoked and that the price was properly set? They had written a check for $10 million. And why do you think that the BCR parties agreed to it? They didn't want to be chased for the $10 million. I suspect that was their motivation. But somehow they missed the whole notion that this judgment in Delaware entered in March of 2011 that said it was appropriately set and that the price was properly set under the terms of the LLC agreement didn't simply moot out every single one of their claims. They basically want to double-dip here. You know, they want to say we took the $10 million, but we really had another claim that is somehow unrelated to our interest in safeguard. Let me ask you something. When their interest was valued and the decision in Delaware was that it was appropriately valued, and the right to get the insurance proceeds was an asset of the company, of the LLP, did that actually wind up as a line item on the balance sheet, or was that just written up in the footnotes as maybe someday this is going to have a happy outcome? Well, I don't think I can tell you the exact answer other than to tell you that the right to receive the insurance proceeds was definitely a contingent value that was specifically valued in making the offer under the buy-sell provision where the company was valued at $500 million. Their 6% entitled them to the $10 million. So it certainly was included in setting the total purchase price under the buy-sell agreement, and quite frankly, they don't get to relitigate that issue. I agree with that. I was just curious whether that somehow wound up as a line item on the balance sheet or whether, as is usually the case with litigation like that, it's a footnote item. I really don't know the answer, and I don't know that the record reflects this. I mean, I know that they took a high value. Now, they don't get to litigate that issue, though, I think is the most important point. And that value includes this whole notion that we used our majority position to block them in exercising their position as a buyer under the buy-sell agreement. Look, if the company was worth $500 million and they had to pay us $490 million to be the buyer, that was going to be difficult. That was difficult from the day they entered into the LLC agreement. What I don't understand is they only had a 6% interest in this thing to begin with, and how they would have taken extraordinary good fortune to be able to put together a package to buy out the other 94% interest and take care of that debt as well. I mean, that was built into the deal from the get-go. That's right. And it wasn't the exercise of our control position or majority position at the time of the dispute that resulted in their lack of leverage. That goes back to 2005. Are you prepared? Can you address this question about one of the privilege issues with your opposing counsel? Are you the group? Your Honor, yes. I'll take it on. All right. The one I'm concerned about is the May 12, 2009 communication, which the Louisiana court deemed not privileged, which the district court deemed privileged. I don't know what it says, but what my notes say, the communication was made by Safeguard's corporate counsel to Morgan Stanley, informing Morgan Stanley that the BCR parties had filed the Louisiana action. And that is the one communication about which I have some question. And the only question I have is if, I mean, I don't know whether that was a correct decision on Judge Brown's part or not. And the question that I have is if we affirm everything here, except that that, does that make any difference anymore? As far as we're concerned, no. We didn't even appeal that issue. We're perfectly happy with living with the determination by Judge, that Judge Brown found that there was a common interest. I'm not sure she got it right on that question, so that's what I'm concerned about. I think we've addressed that issue in the brief. Let me add one thing, one little point, and that was my opponent indicated, you know, quoted out of context, I believe, that we said something in pleadings in Delaware that contradicted the purpose and intent of that Delaware judgment. You know, if you look at the first amended complaint that's in the record, in the Delaware case, we laid out in detail what the BCR parties were doing to frustrate the exercise of the bisell agreement. And it addresses all of these issues and tells them why we wanted this judgment. And it includes every attempt that they have made to parse out that, well, no, no, that has nothing to do with the injury to our interest in safeguard. But we think if you look at that, you'll see that there's no doubt at all what was the intent of the parties here. Thank you, Your Honor. Thank you. Mr. Fruitt. May it please the Court, my name is Stephen Fruitt, Boy Schiller and Flexner, LLP. I represent Defendants Lloyd's Underwriters on this appeal. In the amended complaint in this federal civil RICO action, plaintiffs assert that Lloyd's caused them harm in two related ways. First, that Lloyd's actions during the insurance coverage litigation, alone among 17 carriers involved, delayed and depressed non-party safeguards recovery of what, non-party in this case, of what plaintiffs assert would have been a $350 million or plus insurance payout. And then the second harm is that with the result that plaintiffs who had a minority interest in safeguard, as the panel has heard, were unable to utilize their anticipated piece of that recovery under the LLC agreement so that they could fend off Morgan Stanley's spring 2009 buyout process that resulted in the actual buyout transaction in July of 2009. So these are two intertwined harms that are purportedly caused by Lloyd's Underwriters. The failure to obtain these insurance proceeds and then the failure to retain control of the company. Now, we believe the district court properly found that plaintiffs lack standing to assert causes of action to recover under either harm. And your honors have heard today about why the buyout forecloses the claims in this case. And we concur not just with the analysis of the buyout and its implications for any allegations of harm, but also we think it's important to point out that if there is no ability to claim harm in terms of what you got in terms of your ownership interest, buyout interest in the company, then the fact that you did or didn't obtain an insurance recovery drops out. Because that's an essential piece. You've got to have some lack of value. The plaintiffs have explained that what they lost was the right to own the company and get future profits in the company. If that's foreclosed by the Delaware stipulated judgment in March 2011, then everything else drops out of the case. Very briefly, in terms of the insurance harm, if that was even alive at this point, plaintiffs conceded in the district court. They were not named insureds on the policy. They couldn't make those claims here at this point. They did argue in the district court that they were third-party beneficiaries, but the district court, we think, properly ruled that in order to be a third-party beneficiary under Louisiana law, there has to be a stipulation pour out tree. And without that, and the only way to accomplish that as Eastern District of Louisiana courts have held, is you've got to actually have the named insured in the policy. That's the way to get a stipulation done. That's not done in this case. In any event, plaintiffs abandoned the third-party beneficiary claim when they got to this court. They're not arguing that. And what the plaintiffs say now is that these are not even claims under the policies. And just to digress a moment, to the extent they make any claim that these are derivative claims, that they have derivative rights because they were once owners of safeguard, those claims are completely foreclosed by the settlement in the insurance coverage dispute case that lasted five years. It settled in late 2012, and there are actual classic releases of every kind of future claim by any predecessor owner. There's no question that those claims are foreclosed, and they're also foreclosed by Louisiana's race judicata statute. But I want to address what plaintiffs said. They say these are not claims under the policies that we're talking about here. These are independent claims. And I think that the short answer to that is that even if they say they're not making claims under the excess policies, and even if they say that they're not claiming against Lloyds for bad faith handling of the claims, the bottom line is that the harm is not getting sufficient insurance recovery in the right time frame for them to do the buyout themselves, to buy out Morgan Stanley. And if that's the harm, then that settlement in the insurance coverage case forecloses that. So that is why the district court correctly ruled in that respect. I'd also like to respond to one other thing, because I think that it almost hovers over all of the filings that plaintiffs have made before this court, and that is that somehow the district court got wrong the deference that it owed to plaintiffs' allegations in the amended complaint. And I've read that a bunch of times, and I've thought about it a lot, and kicked it around. And at the end of the day, I've gone back to the briefing, and I've said, where in the briefing have they pointed to a place where the district judge didn't give the allegations deference, contradicted any of the allegations, disregarded any of the allegations in the amended complaint? And I can't find anything. And I would respectfully direct this bench to pages 35 to 36 of plaintiffs' opening brief on appeal, which is the closest they come to saying that the district court reformulated things. And there's no specificity in it. But the only specificity is they say, it wasn't the buyout price we're complaining about. They said, the thing that we have a problem with, that we're claiming, is that we lost our ownership rights, and when we lost our ownership rights, we lost the right to future profit participation in the company. So I thought about that, and I went back to the district court opinion, and at page 65 to 66, the district court uses the exact words that the plaintiff's brief says the district court didn't do. And I think that should end the matter. As specific as they can get in their briefing, the district court meets it, and that's the wording, and that's the concept she used. They lost the ownership rights. They didn't get to participate. That happens to be in the Lloyds-oriented part of the opinion. The only other thing I'd like to respond to in plaintiff's argument, and obviously happy to answer any questions the panel has, is that there was some reference earlier to Morgan Stanley assuring Lloyds that they would not make a bad faith claim, that Morgan Stanley would block a bad faith claim in the insurance coverage litigation. I don't think it's necessary to dwell on this, but Morgan Stanley was the same party that wasn't happy about the insurance coverage litigation being started in August of 2007 anyway. They didn't get in the way of that, notwithstanding their negative power. And I can tell you that it's very unlikely that Morgan Stanley was excited about safeguard bringing a bad faith claim against the primary carrier, which safeguard did. Morgan Stanley didn't block that, and they achieved an extra $1.6 million for that bad faith claim. So I think it's just late in the day to make arguments like that that are just simply belied by the record of which this court can take judicial notice. All right. Thank you, sir. Thank you. Back to you, Mr. King. Judge King, I'd like to address the question that you wanted me to address at the end first regarding the challenged communications in the district court's ruling on that. It's one that I'm interested in. Yes, I understand that. I think that Mr. Vance, when he said that that's still an issue that should probably be decided, regardless to make sure that the record is clear coming out of this court and out of this decision is the correct one, that these are still rulings regarding privilege that need to be addressed in case of whatever additional proceedings might occur. And there are a few things that Mr. Vance said. It's not going to be an issue in this case, is it? If we wind up affirming what happens here, it's not an issue here. I think it's something to consider in making that decision whether to affirm what happens because these communications do actually go to what were the claims and what is at issue and whether or not those claims at issue are part of what was within the scope of the Delaware judgment or not. These communications are really critical to that whole standing analysis because they're communications, and I'm only out of respect for the injunction. I'm going to speak very broadly about them, but where Morgan Stanley concedes the conflict that it was acting within and that the actions it was taking outside of the time frame of May 14, 2009 were in furtherance of that conflict. Now, the basis of Judge Brown's opinion to find that these communications were privileged was this protective order language that came out of the state district court. And when you look at Judge Brown's opinions on these communications, everywhere she has a finding of privilege, it's because of the protective order language that recognized that there is a common legal interest between Morgan Stanley and the BCR parties and that that common legal interest was the safeguard insurance litigation, and therefore she just applies that as an automatic rule of privilege over all shared communications. What the state courts did subsequent to that is clarify that that protective order language was only intended to be a statement of what the common legal interest was, but that still each communication had to be looked at to see if under the applicable law the communication was within that zone of common legal interest. Now here, unlike in the state court, which was bound by the applicable law of Code of Evidence Article 506 under Louisiana, here the federal courts apply federal common law. And in the Fifth Circuit, there is no common legal interest recognized outside of the joint defense context, and Morgan Stanley and the BCR parties were aligned as plaintiffs in the insurance litigation. But more importantly, on the face of those communications that were challenged, there is a demonstration of a conflict with the common legal interest and not communications being made in pursuit of the common legal interest. I mean, Mr. Fruit got up and said, Morgan Stanley didn't want to pursue this litigation. That's exactly right, and that's exactly what these communications demonstrate, and they demonstrate why Morgan Stanley didn't want to, which is the wrongful actions on conflict. Turning to some of the other issues that the defense counsel addressed, one being the Delaware litigation. And Mr. Vance said, you know, look at the PPF allegations in the amended complaint where they're talking about all the complaints that the BCR parties were making in the Louisiana action. The point is, what did they then seek in their prayer for relief? And they sought exactly the limited declarations that the Delaware court issued. And in language I didn't say earlier, although it's in our briefs, the PPF parties said in opposing the stay of the Delaware litigation exactly what was going to be litigated, what was going to need to be discovered. They said specifically the only issue involved in the Delaware action is whether the buy-sell transaction was properly noticed and closed, including the timing of the offer notice and the total purchase price set forth therein. Limited discovery is needed, and this matter can be resolved promptly on dispositive motions from the parties or a simple trial. By contrast, this is PPF, by contrast, the Louisiana action will require a resolution of far more complicated yet unrelated claims and issues that concern PPFs and Morgan Stanley's conduct in obtaining insurance payment from safeguards insurers. This is PPF saying what's going to need to be litigated, and that is telling you what are the issues actually litigated in Delaware that led to those limited declarations in the stipulated judgment. Now, with regard to the negotiation of the buy-sell provision in 2005 and what that provided to the parties, their argument seems to presuppose that that was a buy provision and not a buy-sell provision. They did not have an absolute right to buy at the total purchase price they stated. They had to say what's the total purchase price, and then there is a concurrent right of the BCR parties to line up alternative investors and partners to be the purchasing member so that they would have to sell, and that is something that the BCR parties demonstrated in the past that they were able to do. That's how Morgan Stanley became a partner in 2005. So those kinds of fact issues as to whether or not the BCR parties could actually pull it off had it not been tainted by the wrongful actions of the defendants are fact issues. They're not totally wrong issues. Thank you, Your Honor. Thank you, counsel. Thank you, all counsel, for your briefing and argument. This case will be submitted along with all the other cases that were argued and not argued this week. With that, this concludes the work of this panel. We stand adjourned.